Donald Peter TYBUS, Appellant/
Cross–Appellee,

v.

Catherine Ellen HOLLAND, Appellee/
Cross–Appellant.

Nos. S–8559, S–8560.

Supreme Court of Alaska.

Oct. 15, 1999.

William T. Ford, Anchorage, for Appellant/Cross–Appellee.

Deidre S. Ganopole, Anchorage, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

Donald Tybus and Catherine Holland appeal various aspects of the superior court's property division and alimony award. Because the superior court acted within its discretion when it set the date of separation, classified Catherine's student loans as marital, distributed the marital estate unequally, distributed pensions through the use of Qualified Domestic Relations Orders (QDROs), awarded a judgment lien to Catherine to ensure that Donald would pay marital debts, awarded rehabilitative alimony to Catherine, and ordered each party to pay his or her own attorney's fees, we affirm on those issues. We remand for the limited purpose of ensuring that QDROs were entered for all of the parties' pensions.

## II. FACTS AND PROCEEDINGS

Catherine Ellen Holland and Donald Peter Tybus were married in 1983 in New York. They had no children.

When the couple married, Donald had a master's degree in architecture and worked for the federal government as an architect, while Catherine had a G.E.D. and had finished one year of college. Shortly before they married, Catherine received a full scholarship to college but at Donald's request moved with Donald to California instead of continuing school. In California, Catherine worked for the federal government as a clerk-typist. After four years in California, Donald received a job transfer to Virginia.

Catherine quit her job to supervise the couple's move. In Virginia, she began working for the government again but did not retain any seniority from her previous government service. After two years in Virginia, Donald was transferred to Germany. Catherine's seniority did not transfer and she was effectively demoted. In 1990 Donald was transferred to Washington, D.C. Catherine was promoted, but her promotion was rescinded when Donald was transferred to Alaska.

In 1994 Catherine obtained her B.A. in business. She wished to continue her education by obtaining a master's degree in either psychological counseling or business. After consulting with Donald, she decided to obtain the counseling degree even though it would lead to less of a financial benefit.

In September 1995 Donald moved out of the marital home and filed for divorce. The couple entered marital counseling, but the counseling was unsuccessful. In April 1996 Donald had the locks changed on the marital home to keep Catherine out; Catherine testified that she then knew the marriage was really over. In October Catherine briefly believed that the couple would reconcile, but when Donald told her he did not wish to preserve the marriage, Catherine finally accepted that the marriage had ended.

After the parties separated in 1996, Catherine decided that she needed to earn an M.B.A. in order to support herself. She opted to finish her counseling degree, then in progress, after she learned that she would have fewer M.B.A. requirements if she completed the counseling degree. Catherine obtained her master's degree in psychological counseling in 1997, incurring $10,000 in student loans.

Judge Dan A. Hensley held trial in October 1997 in Anchorage. Donald asked the court to divide the couple's property and award attorney's fees. Catherine requested property division, spousal support, and attorney's fees.

Judge Hensley set the date of separation as April 1996, the date that Donald changed the locks on the marital residence. The primary assets to be divided at trial were: the marital residence, valued at $11,000 after

adjusting for the mortgage, credit card and other consumer debt in the amount of $21,039, Catherine's student loans in the amount of $10,000, $3,962 in tax refunds, two automobiles, a variety of personal property, and a dog. Each party also possessed a retirement account. At the request of the parties, the court divided Donald's Civil Service pension and Catherine's Thrift Savings Plan equally through a QDRO.

At the time of trial, Catherine's earning capacity was $32,000 per year while Donald's was $65,000 per year. Donald also testified that he expected to receive an inheritance of approximately $130,000 within one or two years after trial. Because the trial court found that Catherine had limited earning potential, it distributed the marital estate unequally in her favor. Catherine received one of the cars, the tax refunds, a $2,000 advance on marital assets, and approximately one-third of the personal property, for a total of $12,985 in assets plus her share of the pensions.[1] Donald received the other car, the marital residence, approximately two-thirds of the personal property, the consumer debt, the student loans, and the dog, for a net liability of $9,778 plus his share of pensions.

To allay Catherine's concerns that Donald's late payment of bills in her name would negatively affect her credit rating, Judge Hensley awarded Catherine a judgment lien in the amount of the debts in her name, secured by Donald's expected inheritance.

Because it found that the unequal division of the marital estate did not rectify the disparity in earning power between the parties, the trial court also awarded Catherine rehabilitative alimony. The court ordered Donald to pay Catherine $750 per month for two years so that Catherine could go back to school and earn an M.B.A.

Finally, the court ordered that both parties pay their own attorney's fees.

Donald appeals, arguing that the trial court abused its discretion by classifying the student loans as a marital liability, unequally distributing the property, requiring security for Donald's payment of the marital debts, and awarding rehabilitative alimony to Catherine. Catherine cross-appeals, arguing that the trial court abused its discretion by setting the date of separation as April 1996 and requiring each party to bear his or her own attorney's fees.

## III. STANDARD OF REVIEW

Trial courts exercise broad discretion in the division of marital assets.[2] Property division upon divorce is a three-step process. First, the court determines what property is marital and thus available for division.[3] We generally review classification of property for an abuse of discretion,[4] although classification of some items may present a question of law to which we apply our independent judgment.[5] Second, the court places a monetary value on the marital property.[6] We will reverse this factual determination only if it is clearly erroneous.[7] Third, the court equitably distributes the marital property.[8] We review this step for an abuse of discretion and will affirm unless the division is clearly unjust.[9] We review a trial court's award of rehabilitative alimony, determination of the date of separation, and decision whether or not to award attorney's

---

1. This figure includes $2,000 that Donald paid Catherine pursuant to a pre-trial stipulation.

2. See Johns v. Johns, 945 P.2d 1222, 1224 (Alaska 1997).

3. See Brotherton v. Brotherton, 941 P.2d 1241, 1243 (Alaska 1997) (citing Moffitt v. Moffitt, 749 P.2d 343, 346 (Alaska 1988)).

4. See id. at 1243.

5. See Cox v. Cox, 882 P.2d 909, 913 (Alaska 1994).

6. See Brotherton, 941 P.2d at 1244 (citing Wanberg v. Wanberg, 664 P.2d 568, 570 (Alaska 1983)).

7. See id.; Musser v. Johnson, 914 P.2d 1241, 1242 (Alaska 1996).

8. See Brotherton, 941 P.2d at 1244.

9. See Cox, 882 P.2d at 914 (quoting Doyle v. Doyle, 815 P.2d 366, 368 (Alaska 1991)).

fees for an abuse of discretion.[10]

## IV. DISCUSSION

### A. The Trial Court Did Not Abuse Its Discretion When It Set the Date of Separation as April 1996.

■ The proper date after which property should be classified as post-marital is "ordinarily the date of the functional termination of the marriage."[11] Alaska law has defined this as the point at which "the marriage has terminated as a joint enterprise" or when a couple is no longer "functioning economically as a single unit."[12] Determination of the separation date is a fact-specific inquiry.[13]

■ Here, the trial court set the date of separation as April 1996, when Donald changed the locks on the marital residence. Judge Hensley found that Donald did not clearly communicate to Catherine before that time his wish to end the marriage but that when he changed the locks to exclude her from the home, "at that point both parties should have understood that the relationship was terminated." We agree.

Catherine argues that "the changing of the locks had little effect on the parties' relationship" because they continued to have a sexual relationship until October 1996. This argument has no merit. First, as Donald points out, Catherine cites no authority for the proposition that sexual contact between the parties is a dispositive factor in determining date of separation. And even though some situations might exist in which a couple's continuing intimate relationship indicated their desire to keep the marriage intact, this is not such a case.

Catherine reasons that it would be unfair to allow one party to "unilaterally effect a 'final separation' by forming a subjective intent to end the marriage, even as they are giving a contrary message to their spouse and continuing to engage in conjugal relationships." But Donald adequately communicated his intent to end the marriage when he re-keyed the marital home. Indeed, Catherine herself testified that she first recognized that the marriage was over when Donald changed the locks. Although she also testified that she briefly believed that the couple's one later sexual episode might indicate that Donald had changed his mind, we agree with the superior court that the marriage was functionally over and that Catherine and Donald were no longer part of a joint enterprise in April 1996.

### B. The Trial Court Did Not Abuse Its Discretion When It Classified Catherine's Student Loans as Marital.

Donald challenges both the superior court's classification of Catherine's student loans as marital property and the court's allocation of that debt to him. With regard to the loans' classification, Catherine responds that Donald waived this argument by not raising it in the lower court. We agree.

■ We will not consider arguments that parties fail to raise in the lower court, let alone arguments they have conceded below, unless the trial court committed plain error.[14] Here, Donald argued below only that the court should allocate the student loan debt to Catherine, not that it was a non-marital debt. Indeed, he included the student loans in the list of marital property in his trial brief. In closing argument, Donald's attorney stated that the loans "should remain on Catherine's side of the ledger" but did not argue that they were non-marital debts. Accordingly, we decline to consider the classification argument because Donald waived it.

---

10. See Beard v. Beard, 947 P.2d 831, 834 (Alaska 1997) (attorney's fees); Hanlon v. Hanlon, 871 P.2d 229, 231 (Alaska 1994) (date of separation); Bays v. Bays, 807 P.2d 482, 485 (Alaska 1991) (rehabilitative alimony).

11. Hanlon, 871 P.2d at 231.

12. Id. at 231 (quoting Schanck v. Schanck, 717 P.2d 1, 3 & n. 7 (Alaska 1986)).

13. See Hatten v. Hatten, 917 P.2d 667, 671–72 (Alaska 1996); Hanlon, 871 P.2d at 231.

14. See Wettanen v. Cowper, 749 P.2d 362, 364 (Alaska 1988) (holding argument waived because litigant not only failed to raise argument in lower court but also because he "implicitly conceded" the inapplicability of his argument).

### C. The Trial Court Did Not Err in Its Unequal Division of the Marital Property.

Donald argues generally that the overall division of property, including the court's assignment of Catherine's student loans to him, was unfair. In particular, he argues that the record did not justify the trial court's decision to allocate all the marital debts to Donald. We disagree.

When dividing marital property, trial courts must consider the so-called *Merrill* factors,[15] now codified at AS 25.24.160(a)(4). Although a fifty-fifty distribution of marital assets is presumptively the most equitable,[16] trial courts have broad discretion to fashion property settlements and may divide the assets and liabilities unequally if they find that such a division is just after consideration of the statutory factors.[17]

Here, the trial court discussed each applicable statutory factor and stated that it based its decision to distribute the marital assets unequally primarily on the parties' unequal earning power, stations in life, and conduct during the marriage. The trial court specifically focused upon its factual finding that Catherine's earning power was less than half of Donald's.

Donald does not dispute this rationale or point to any statutory factor that the trial court failed to consider; indeed, he concedes that the trial court's factual findings regarding unequal earning power "might have justified a property division in Catherine Holland's favor." But he insists that the trial court's findings did not "justify ordering [him] to pay all of the marital obligations." Although the trial court's property division certainly favored Catherine, it does not rise to the level of being clearly unjust. Donald's income at the time of trial was $65,000 per year, and he testified that he took home about $4,000 per month, compared to Catherine's annual salary of $32,000 and monthly earnings of $1,800. And while Catherine testified that she was borrowing money and living "bare to the bone," Donald testified that he had monthly disposable income of over $2,200. Under these circumstances, the trial court committed no error in allocating the marital debt to Donald.

### D. The Trial Court Was Not Required to Value the Retirement Benefits, but Erred in Failing to Consider whether Catherine Had a Federal Employment Retirement System Benefit.

Donald next contends that the trial court erred because it did not value both parties' pensions, instead dividing each pension equally through entry of a QDRO. QDROs allow superior courts to retain jurisdiction over nonvested pensions and order payments of the former spouse's portion of the pension when it vests.[18] Although Catherine responds by arguing the merits of this issue, we hold that Donald has waived this argument.

As stated above, we will not consider arguments on appeal if the parties failed to raise those arguments in the lower court, let alone arguments they have conceded below, unless we find that the trial court committed plain error.[19] In its oral findings, the trial court noted that "[t]his case was tried under the assumption that the court would simply divide each pension equally through a Qualified Domestic Relations Order." Not only was this valuation method a premise underlying the trial, but both Catherine and Donald explicitly asked the court to deal with the pensions in this manner. In her trial brief, Catherine stated to the court that "[t]he parties' pensions and retirement benefits should be divided equally with QDROs." Donald also asked the court to value and distribute the pensions in this manner, telling the court that "[t]he parties agree that their respective federal pensions should be divided by appropriate Qualified Domestic Relations Orders."

---

15. *See Merrill v. Merrill,* 368 P.2d 546, 547–48 n. 4 (Alaska 1962).

16. *See Miles v. Miles,* 816 P.2d 129, 131 (Alaska 1991).

17. *See Laing v. Laing,* 741 P.2d 649, 651 (Alaska 1987).

18. *See Laing,* 741 P.2d at 657–58.

19. *See Wettanen,* 749 P.2d at 364.

Accordingly, Donald waived his claim that the trial court was required to value and divide the pensions.

 Donald raises one other point regarding the QDROs, however. He notes that the trial judge's findings of fact and conclusions of law make no mention of any Federal Employee Retirement System (FERS) benefits. Review of the record indicates that there was a dispute at trial as to whether Catherine has any FERS accounts; she testified that she did not, while Donald asserted before and during trial that Catherine did possess such an account. The trial court's order divided Donald's retirement benefits and ordered that Catherine's Thrift Savings Account be equally divided as well. But it made no mention of Catherine's FERS benefits. This indicates that the court may not have entered a QDRO for every existing retirement pension. Accordingly, we remand so that the court can determine whether Catherine does have a FERS account.[20] If so, the court should enter a QDRO appropriately dividing that pension between the parties.

E. *The Trial Court Did Not Err When It Required Donald to Use His Non-marital Inheritance as Security for Payment of Marital Debts.*

 Donald next contends that the trial court committed reversible error when it granted Catherine a judgment lien for payment of the bills in her name secured by Donald's expected inheritance. In entering this order, the trial court discussed Donald's history of poor money management and unpaid bills and Catherine's concerns that Donald's uneven payment of bills in her name would negatively affect her credit rating.

First, Donald argues that there is no need for a judgment lien because the record does not support the finding that Donald might fail to make the required payments. This claim has no merit. Donald testified that he had made late payments or skipped payments on a variety of bills in his own and Catherine's name and stated that "for the last three or four years, I have not done a good job of paying bills as far as on time" due to a lack of organization. Based on this record, the trial court had ample reason to be concerned that Donald might not timely pay off all of the marital debts.

 Second, Donald argues that using the inheritance for security is tantamount to ordering Donald to use separate property to pay marital debts. But as Catherine notes, the trial court did not actually order that he use non-marital funds to pay any marital bills; it merely granted Catherine a way to ensure that bills in her name would be paid. Moreover, Alaska law supports the idea that trial judges have discretion to require security for payment of marital debts; we have held that although trial courts are not required to secure indebtedness, "creative suggestions [for providing security] ... come within the ambit of the superior court's discretion."[21] The trial court here did not abuse that discretion, and we thus affirm its decision to require security.

F. *The Trial Court's Award of Rehabilitative Alimony Was Not an Abuse of Discretion.*

Both Donald and Catherine argue that the trial court's award of rehabilitative alimony was an abuse of discretion. Donald contends that no alimony at all was warranted, while Catherine maintains that the alimony awarded was insufficient. We reject both claims and affirm the rehabilitative alimony award.

 A trial court awards rehabilitative alimony to enable a party to complete education, job training, or other "means directly related to the end of securing for one party a source of earned income."[22] Alimony awards are allowable when "just and nec-

20. *See Laing,* 741 P.2d at 657–58 (directing trial courts to enter orders, such as QDROs, retaining jurisdiction over nonvested pensions).

21. *See Money v. Money,* 852 P.2d 1158, 1163 (Alaska 1993).

22. *Schanck v. Schanck,* 717 P.2d 1, 5 (Alaska 1986).

essary,"[23] and "[t]his court leniently reviews awards of limited duration, such as the one here."[24] The party seeking rehabilitative alimony should present an educational or job training plan so that the reviewing court can determine whether a support award is necessary and appropriate.[25]

At trial, Catherine presented a plan to increase her earning capacity. She testified that she wanted to enter an M.B.A. program costing $10,000 to $14,000. The program would take four years to complete and would result in an earning capacity in excess of $40,000 per year.[26] The trial court ordered Donald to pay Catherine $750 per month for two years so that Catherine could go back to school and earn an M.B.A.

Donald attacks the award of rehabilitative alimony on three grounds. First, he claims that the record does not support the court's finding that Catherine made career sacrifices to further his career. This argument is meritless. The evidence supports a finding that during the marriage, the couple moved from New York to California, to Virginia, to Germany, to Washington, D.C., and then to Alaska. Each time, Donald received a promotion or a lateral transfer, while Catherine was demoted or laid off. Donald attempts to rebut this evidence by pointing out that neither spouse enjoyed living in California and that Catherine's continuing education did allow for some career advancement. These points are only tangentially relevant because they do not counter the large quantity of evidence showing that Catherine limited her career to further Donald's. Donald thus has failed to show that the trial court's findings were clearly erroneous.

Second, Donald argues that Catherine is already employable and does not need alimony. We disagree. We have approved alimony awards to spouses who were minimally employed at the time of divorce.[27] Donald argues that we should not adopt a rule that would allow "already self-supporting [spouses] to further enhance their income capacity in the future" and instead should restrict alimony to divorcing spouses who are truly unable to support themselves. But Judge Hensley found that Catherine's earning capacity was minimal and unlikely to increase without additional education. The court noted that Catherine's earning capacity was $32,000 per year and that it was unlikely to increase without further schooling. The court found that this income level was barely sufficient for Catherine's support: "[S]he can support herself at $32,000.00, but at a minimal level with no cushion to pay for unexpected expenses or anything but the necessities." This finding is supported by Catherine's testimony that she lived in an unsafe neighborhood and needed to borrow money to get by. Under these circumstances, we will not disturb Judge Hensley's decision that rehabilitative alimony was necessary and just in this case.

Third, Donald contends that Catherine should not receive alimony payments to obtain her M.B.A. because she would already have an M.B.A. if she had not chosen to pursue her counseling degree. This claim is meritless. We have held in the past that spouses who advanced their employability through education during the marriage but still needed further education to be marketable were entitled to alimony.[28]

On the other hand, Catherine argues that the trial court abused its discretion by awarding too little alimony. At trial, Catherine requested $54,000 in alimony over a five-year period. She stated that although the cost of her schooling was only $10,000 to $14,000, she wanted the extra money to move

23. *Nelson v. Nelson*, 736 P.2d 1145, 1147 (Alaska 1987) (quoting AS 25.24.160(3)).

24. *Ulsher v. Ulsher*, 867 P.2d 819, 822 (Alaska 1994); *see also Harrelson v. Harrelson*, 932 P.2d 247, 254–55 & n. 9 (Alaska 1997).

25. *See Myers*, 927 P.2d at 327–29; *Ulsher*, 867 P.2d at 822 & n. 5.

26. Catherine's testimony was sufficient to satisfy the requirement set forth in *Myers v. Myers*, 927

P.2d 326 (Alaska 1996), that a rehabilitation plan "identif[y] a career goal, a degree program aimed at realizing that goal, and a time frame during which the degree may be earned through reasonable diligence." *Id.* at 328.

27. *See Ulsher*, 867 P.2d at 822.

28. *See Myers*, 927 P.2d at 328.

to a nicer neighborhood. She argues now that the court abused its discretion by recognizing that she needed further education, but refusing to fund that education completely. But the court had no duty to award alimony that would fully fund Catherine's plan. Further, the trial court's actual award exceeded the tuition expenses that Catherine testified she would need to complete her M.B.A. program. We therefore believe that the trial court did not abuse its discretion in making the award that it did. Accordingly, we affirm the rehabilitative alimony award.

### G. The Trial Court Was Not Required to Award Attorney's Fees to Catherine.

 Citing *Notkin v. Notkin*,[29] Catherine maintains that the trial court abused its discretion by refusing to award her fees because it ignored its own findings that Catherine's economic situation and earning power were inferior to Donald's. In *Notkin*, we noted that "the relative economic situation and earning power of each party" were relevant to a trial court's decision to award attorney's fees.[30] In support of her argument that the *Notkin* factors required an award of attorney's fees to her, Catherine cites the trial court's findings that Donald's earning capacity greatly exceeded hers, that her income was barely enough to live on, and that Donald was in a better position to pay the fees. But we have repeatedly held that a party's economic situation includes more than simply earning power; the property division itself is relevant to the trial court's decision to award fees.[31] In particular, we have stressed that a party who receives a property settlement sufficient to cover incurred attorney's fees should expect to pay his or her own attorney's fees.[32]

 The trial court here noted that "Donald is clearly in a better position to pay attorney's fees"—presumably due to his greater earning potential—but stated that "because of the unequal property division and the alimony order, I think it's equitable that each party be responsible for his or her own attorney's fees." Catherine has sufficient assets from the property award such that she can be reasonably expected to shoulder her own fees. The trial court awarded Catherine $3,962 in cash from tax refunds. She also received $2,023 in personal property, $2,000 cash from Donald as an advance on marital assets, and rehabilitative alimony of $750 per month for two years—a total of $18,000—which exceeds the direct costs of obtaining her M.B.A. These assets should be more than sufficient to pay for approximately $6,000 in attorney's fees. Thus, the trial court's decision to require the parties to pay their own attorney's fees was not an abuse of discretion.

## V. CONCLUSION

Because the superior court acted within its discretion when it set the date of separation, classified Catherine's student loans as marital, unequally distributed the marital estate, distributed pensions through the use of QDROs, awarded a judgment lien to Catherine to ensure Donald would pay marital debts, awarded rehabilitative alimony to Catherine, and ordered each party to pay his or her own attorney's fees, we AFFIRM those aspects of the court's decision. But because the court may not have divided every existing retirement pension by a QDRO, we REMAND for that limited purpose.

**29.** 921 P.2d 1109 (Alaska 1996).

**30.** *Id.* at 1114 (quoting *Hartland v. Hartland*, 777 P.2d 636, 644 (Alaska 1989)).

**31.** *See Money*, 852 P.2d at 1165; *Siggelkow v. Siggelkow*, 643 P.2d 985, 989 (Alaska 1982).

**32.** *See Money*, 852 P.2d at 1165 (refusing to alter trial court's award of limited attorney's fees because the requesting party's portion of the property "includes more than enough cash to cover her remaining attorney's fees"); *H.P.A. v. S.C.A.*, 704 P.2d 205, 212 (Alaska 1985) ("Assuming that Husband possesses greater financial resources and greater earning capabilities, Wife's resources and capabilities are sufficient enough that a court could reasonably expect her to pay her own fees."); *Siggelkow*, 643 P.2d at 989 (reversing award of attorney's fees to wife and ordering parties to pay their attorney's fees because "Marilyn received a substantial property award from which she could have paid her attorney's fees").